### In re LELAND.

(District Court, W. D. Michigan, S. D. February, 1910.)

1. BANKRUPTCY (§ 57*)—ACTS OF BANKRUPT—CONVEYANCE IN FRAUD OF CREDITORS.

Where a bankrupt's deed to a farm was without consideration, and, if sustained, would have operated to defraud the bankrupt's creditors, it constituted an act of bankruptcy.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 57.*]

2. BANKRUPTCY (§ 91*)—DEBTORS—EXEMPT CLASS—BURDEN OF PROOF.

While the primary burden is on the petitioning creditor to show that the alleged bankrupt is not among the exempt classes, yet, where it appears that the debtor, who claimed to be a farmer, had left his farm more than 14 years ago, and had gone into other active business, in which he continued for several years, the burden shifted to the contestants to show that he again regained an exempt status.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 91.*]

3. BANKRUPTCY (§ 67*)—PERSON SUBJECT TO ADJUDICATION—EXEMPT STATUS —TIME.

Whether an alleged bankrupt is within a class of persons exempt from bankruptcy adjudication is to be determined as of the date of the alleged act of bankruptcy.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 67.*]

4. BANKRUPTCY (§ 91*)—PERSON SUBJECT TO ADJUDICATION—PERSON ENGAGED IN FARMING—EVIDENCE.

In proceedings to adjudge respondent a bankrupt, evidence *held* insufficient to show that he was exempt as a person chiefly engaged in farming.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 91.*

What persons are subject to bankruptcy law, see note to Mattoon Nat. Bank v. First Nat. Bank, 42 C. C. A. 4.]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In the matter of bankruptcy proceedings against Charles L. Leland. Application for adjudication. Granted.

Stewart & Sabin, for bankrupt.
Stewart & Jacobs, for creditors.

DENISON, District Judge. The issue, whether the adjudication should be made, involved three questions: First, was the debtor insolvent, at the filing of the petition? second, had there been an act of bankruptcy? third, was the debtor within the exempted classes?

As to the first question, I understand it to be conceded by counsel that the property or money, which the debtor apparently took away with him, should not be included in any computation of assets, and that, therefore, the necessary insolvency existed.

As to the second question, the conveyance of the farm by Leland, by deed dated December 28, 1908, but delivered about January 7, 1909, was confessedly without consideration, and, if it could have been sustained, would have manifestly operated to defraud creditors. That must have been its purpose and intention. So, also, as to any surplus value, above the exemption, in the village home (considering this deed as if made to the wife). Whether there was such surplus value is not important, because the conveyance of the farm, if other necessary conditions exist, is a sufficient basis for an adjudication in bankruptcy. The attempted reconveyance of the farm by Scott was not operative. It was recorded, but it was never delivered. The legal title, therefore, continued to remain in Scott, as grantee, under the fraudulent deed.

The third inquiry presents the more difficult question. The facts are: About 1895 Leland sold his farm and took up his residence in the village of Colon, about two miles away. Here he owned and occupied a home, continuously, from that time until January, 1909. Upon leaving the farm, he rented it, and it continued to be rented to various tenants from that time until the filing of this petition. Leland, upon moving into town, first bought out a drayage or livery business, and continued at that about two years. He then went into the agricultural implement business, which also was continued about two years. He then, in partnership with another, engaged in the hardware business, and was so engaged about four years. This business was sold out or given up, and he next became secretary of the local creamery company. He held this position about three years, and during the same period was a deputy sheriff. For two or three years immediately preceding January, 1909, he had no very active business. He bought and sold or traded horses, more or less, keeping them at his village home; he had one or two supposed fast horses which he raced at county fairs; he had one stock horse, which, through an associate or employé, he kept in an adjoining township; and he clerked at a store occasionally for a short time. These things were in addition to such attention as he gave his farming interests.

No details as to the nature of the farm leases during the first 13 years of the period appear, but by the lease executed by him to a tenant and covering the last year of the period, a year which had not expired in January, 1909, it appeared that the entire farm was leased

to a tenant in an ordinary way, and upon shares. The tenant was to do all the work, and furnish tools, implements, etc., and everything excepting one-half of the seed, and the produce was to be equally divided. The lessor retained no control whatever over the farming operations or the nature of the crops to be raised, excepting by the provision for "workmanlike" operations, and excepting as implied in the evident purpose to devote the farm mainly to stock purposes. In addition to these provisions, the lease showed that the parties engaged in a joint enterprise in selling milk, through the means of a milk route in town, and the tenant, instead of delivering one-half of the farm produce to the lessor, was, as to all parts suitable, to feed the undivided produce to a herd of cows, of which herd each party practically owned one-half, and then the tenant was to sell the milk so produced, and apparently pay over to the landlord one-half of the money received.

The primary burden is doubtless upon the petitioning creditor to show that the alleged bankrupt is not among the exempted classes; but when it clearly appears that the debtor, 14 years ago, had left his farm, and moved into town, and gone into other active business, and continued that for several years, so that he had lost his status as one chiefly engaged in farming, it seems that the burden properly rests upon the contestants to show that he has again regained the exempt status.

It is important to know at what time the exempt status must have existed in order to prevent the adjudication. The natural meaning of the words used by the statute would indicate that they referred to the time of filing the petition, but the necessities of the case have led to the conclusion that this meaning cannot be adopted. There is some authority for dating the question back to the time when the indebtedness was incurred; but this would, many times, give rise to great confusion, as if, for example, part of the indebtedness of the petitioning creditors had a favorable position under this rule and part did not, and it does not seem necessary, in the ordinary case, to go back so far. The decision of the Court of Appeals, in this circuit, in Flickinger v. First National Bank (6th Circuit), 16 Am. Bankr. Rep. 678, 145 Fed. 162, 76 C. C. A. 132, establishes the rule, at least for the ordinary case, that the date of the act of bankruptcy is the determinative date, and this, in the present case, is about January 7, 1909.

It does not follow that the time when the debts accrued and the nature of the debts of the petitioning creditors are wholly immaterial. If they accrued, in large part or wholly, out of business other than farming, this fact may be quite persuasive as indicating that the debtor was not chiefly engaged in farming. The fact that the debtor, at the time in question, may have had no other occupation, worthy to be called a business, in addition to his farming interests, does not establish, and is by itself of little value as indicating, that he was chiefly engaged in farming. The statute makes subject to its provisions any natural person, unless he is chiefly engaged in the exempt occupations, and the man who has no active business, but is only giving attention to his investments of capital, as an ordinary investor does, would seem to be subject to adjudication.

The status of Leland, during several years, is described about as accurately as possible by one of the witnesses, by using the term "retired farmer." He rented his farm and abandoned any control or direction of its operation. During the last two or three years of the period, he had no serious or engrossing business. He did such miscellaneous work as came along. He dealt a little in horses, and kept a stock horse, etc.; but these were things which any farmer might do, and neither can be spoken of as a business. He looked after his farm interests to the extent of seeing that the tenant was carrying on the work and dividing the proceeds as agreed; but any further attention than this to his farming business was voluntary and incidental. I do not see that it was important whether he received from his tenant money rent or rent in kind, so long as the landlord was not himself carrying on the farm operations and had no right to direct or control them. Leland's capital was invested in his farm, and he was giving casual and ordinary attention to that investment; but he was not, by his own labor or by his own directing skill, engaged in the business of farming.

The opinion by Judge Severens, in Gregg v. Mitchell (6th Circuit) 21 Am. Bankr. Rep. 659, 166 Fed. 726, 92 C. C. A. 415, 20 L. R. A. (N. S.) 148, is not inconsistent with this conclusion. In the Gregg Case, the debtor was essentially and primarily engaged in farming, and had been continuously so engaged, and the decision was that he did not cease to be so engaged because he turned a portion of the produce of the farm into milk and sold the milk. The decision, apparently, would have been the same, if the entire output of the farm had been in the ultimate form of milk; but that case depends upon the proposition that the business of selling milk may be properly incidental to a farming business, and that a regular farmer does not change his main occupation by using his farm in that way. It seems to be equally true that an established dealer in milk would not lose that occupation, and become "chiefly engaged in farming," just because he occupied a farm to supply him with a part or with all of his milk output—especially if he did not live himself upon the farm or direct the farm operations. In this case, Leland had been a merchant doing business in the village, and incidentally having his capital invested in a rented farm. After he ceased to be a merchant, he still continued the same relation to the farm; and the fact that during the last year the rent was paid to him in the shape of half the proceeds of the milk sales did not, I think, make him "chiefly engaged in farming."

Even if there was any doubt about Leland's status at an earlier date, say in the summer of 1908, I think that the doubt was removed by later occurrences. In October there was a fire, burning the buildings upon the farm, excepting the house, and burning also the stored crops. This made a distinct change in the situation, and it was for Leland to determine whether he would rebuild and put things in condition to be carried on as before, or whether he would largely abandon existing plans and not devote the insurance money to the maintenence of this investment. He adopted the latter alternative, and evidenced its adoption by having an auction, in which, the testi-

185 F.—53

mony is, he sold off practically everything. Apparently this would include the cows upon the farm, though that is not vital. It is clear enough that, at least at the time of the auction, he had abandoned the business of farming, even so far as he had been engaged in it, and had determined to take what money he could get together and go away. No particular act was necessary, in order to make effective this abandonment of his farming, because he was not then engaged in any positive acts of farming, and his mental conclusion to give it up, in connection with his failure to rebuild, and his auction, make a sufficiently complete abandonment. Under these circumstances, whatever may be thought of the earlier situation, it cannot be said that on December 28, 1908, or January 7, 1909, Leland was chiefly engaged in farming. He had given up what connection he had with farming, and he was "chiefly engaged" in getting ready to go away.

Further, it seems that another act of bankruptcy will probably occur when the pending levies reach a point five days before execution sale, and at that time there is no likelihood that Leland will be "engaged in farming." Whatever result was now reached, a new petition could then be filed, and would result in an adjudication, whether the controlling date was that of filing the petition, or that of the completed act of bankruptcy, or even, by relation back, that of levying the attachments.

The order of adjudication in bankruptcy should be made.